FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

2023 JUN -5 PM 3: 16

OFFICE OF THE CLERK

**JACARA THOMPSON**, on her own behalf and
on behalf of her minor son **J.T.**,

Plaintiff,

VS.

Case No. 8:23CV245

**TODD SCHMADERER**, individually,
And in his official capacity as City of
Omaha, Nebraska Chief of Police,

And

**BRIAN DIMINCO (Shield No. 1988)**,
individually and his official capacity
as City of Omaha Police Officer;

and

**OFFICER TYLER BOYER (Shield No.
2458)** individually and in his official
Capacity as City of Omaha Police
Officer;

and

**OFFICER PHILLIPS (Shield No. 2452)**
individually and in his official capacity
as City of Omaha Police Officer;

and

**CITY OF OMAHA, NEBRASKA,**
**DOUGLAS COUNTY,**

Defendants.

1

## COMPLAINT
## JURY TRIAL DEMANDED

Plaintiff Jacara Thompson, on her own behalf and on behalf of her minor son J.T., proceeding

pro-se, for her complaint, alleges as follows:

### I.

## PRELIMINARY STATEMENT

1). This is a civil action seeking damages against Todd Schmaderer, who is the City of

Omaha Police Chief; Brian Diminco (#1988), who is an OPD Police Officer; Tyler Boyer

(#2458), who is an OPD Police Officer Phillips (# 2452); the John Doe police officers of OPD,

the City of Omaha, Douglas County, whose identities are unknown to plaintiff at this time;

Douglas County, Nebraska; The City of Omaha ("Defendants"), for committing acts, under color

of law, which deprived Plaintiffs of rights secured under the Constitution and laws of the United

States and the State of Nebraska; and, for refusing of failing to prevent such deprivations and

denials to Plaintiffs. Plaintiffs alleged, among other things, that Defendants intentionally,

negligently and/or recklessly caused Plaintiff to be subject to unnecessary, unwarranted and

excess force, illegal, unlawful and false arrest, and malicious prosecution that were not based

upon probable cause, and other violations of their constitutional rights. This action seeks both

compensatory and punitive damages against the defendants for the intentional acts of

wrongdoing and negligence under State law.

### II.

## JURISDICTION

2). This action is brought pursuant to 42 U.S.C. 1983 and 1988 and the Fourth Amendment to

the United States Constitution. This court has jurisdiction over this action under 42 U.S.C. 1983,

2

28 U.S.C. 1343 and 28 U.S.C. 1331. Plaintiff further invokes the supplemental jurisdiction of this court to hear and decide claims arising under State law, pursuant to 28 U.S.C. 1367.

## III.

### PARTIES

3). Plaintiff Jacara Thompson is a 4$-year-old African-American woman who at all relevant times was a resident of the State of Nebraska. She is also the mother of J.T., a minor child.

4). At all relevant times herein, Defendant Todd Schmaderer was City of Omaha Chief of Police and acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the City of Omaha, Nebraska; and the City of Omaha Police Department; and, pursuant to his authority as the Chief of Police.

5). At all relevant times herein, Defendant Brian Diminco **(Shield No. 1988)** was a City of Omaha Police Officer and acted under color of laws, statutes, ordinances, regulations, policies, customs and usages of the City of Omaha, Nebraska; and, the City of Omaha Police Department; and pursuant to his authority as a police officer.;

6). At all relevant times herein, Defendant Tyler Boyer **(Shield No. 2458),** was a City of Omaha Police Officer and acted under color of laws, statutes, ordinances, regulations, policies, customs and usages of the City of Omaha, Nebraska; and, the City of Omaha Police Department; and pursuant to his authority as a police officer.;

7). At all relevant times herein, Defendant Officer Phillips **(Shield No. 2452),** was a City of Omaha Police Officer and acted under color of laws, statutes, ordinances, regulations, policies,

3

customs and usages of the City of Omaha, Nebraska; and, the City of Omaha Police Department; and pursuant to his authority as a police officer.;

8). At all relevant times herein, Defendant John Doe police officers, were a City of Omaha Police Officer and acted under color of laws, statutes, ordinances, regulations, policies, customs and usages of the City of Omaha, Nebraska; and, the City of Omaha Police Department; and pursuant to his authority as a police officer.;

## IV.

## STATEMENT OF FACTS

9). Plaintiff Jacara Thompson and her minor son adopt and incorporate by reference paragraphs 1-8 of this complaint as if fully set forth herein.[1]

10. On June 9, 2021, Thompson took her minor son to Children's Hospital located at 8316 no 30th Street because her son had, among other things, lost an extraordinary amount of weight. He was way to small in stature for his age, smaller than when he was born. Prior to that, Thompson had already taken her son to the hospital, to no avail, continually getting the run around about what was wrong with her son for five and a half months straight.

11). Thompson spoke to a pediatrician by the name of Doctor Nicholas Stier. As Steir listened, Thomas explained the unnatural weight of her son, and also, how her son's belly button was protruding from his stomach in an unnatural manner. And that, she did not want to leave the

---

[1] In order to provide context to the events that led up to the arrest of Thompson, which is what this civil suit is about, Thompson must provide a detailed story of the events that led to her unlawful, illegal seizure and arrest by Omaha Police Officers so that the court can thoroughly understand the egregious nature of the police officers conduct.

4

hospital until staff conducted a thorough examination on J.T. After a brief examination of J.T.,
Steir arrived at the conclusion that J.T. was malnourished.

12). Thompson highlighted, to the contrary, that she persistently breast fed J.T., and had just
finished doing so. From there, Steir directed Thompson to immediately take J.T. to Children's
Hospital. He called Children's Hospital to have a bed prepared for J.T.

13). On that same day, J.T. was checked into CHI Health Clinic Family Medicine, located at
8200
8600 and Dodge Street. Thompson spoke to a nurse that she had previously spoke to about J.T.,
who told Thompson that she could not keep bringing J.T. up there for essentially nothing,
something that requires a mere band aid.

14). Thompson had her one of her children with her at the time she went to Children's
Hospital. After several hours, from 2pm up until 11pm that night, the hospital finally got a bed
for J.T. From there, Thompson called her other daughter, Justyce Thompson, to come up to the
hospital and pick up Thompson's other children.

15). Once upstairs in the room, the nurses kept implying that Thompson was not feeding J.T.,
notwithstanding the fact that Thompson was persistently, every two hours, breast feeding J.T
since she had been there – and before she had arrived, essentially since J.T.'s birth. The nurses
kept asking Thompson what *she did* to J.T. Thompson repeatedly explained that she did nothing
to her son other than care for, feed and love her son. Indeed, she has seven children, as she
explained to staff. So knows exactly how to care for a child.

16). Staff, nevertheless, kept accusing Thompson of being fidgety, and also starving J.T. Staff
did this all throughout the night, up until the next day. Thompson she could not go to sleep
because she was worried about J.T.

5

17). On the second day, Thompson sister came up to the hospital. Again, staff continuously accused Thompson of starving her child. Then, start demanding that Thompson provide more breast milk. She did, by pumping her breast. Thompson sister explained to staff that, common sense dictates that, is she is continuously breast feeding J.T. and providing breast milk, she could not have been starving J.T. Since Thompson's sister was present, Thompson left for a short period of time to retrieve some milk that she already had prepared. A whole bunch of bottles.

18). On day three, the story remained the same. Staff repeatedly and egregious accused Thompson of starving J.T. As a result of drinking Thompson breast milk, Thompson was told by medical staff that J.T. had broke out. Based upon Thompson's knowledge and belief, however, Thompson is of the opinion that staff gave J.T. some generic bottled milk, although Thompson specifically told staff that she only gave all of her children breast milk.

19). At this point, the doctors tell Thompson that they could not figure out what was wrong with J.T. The doctors told Thompson that is has to be something eternal – precisely what Thompson had been saying all along. From there, Child Protective Services ("CPS") came to the hospital room to talk to Thompson (at the direction of Children's Hospital's medical staff). Thompson daughter Jurnee is present. Jurnee told CPS to leave the room because they had no authority to speak to Thompson about her child concerning any medical issues, because there was absolutely positively no proof of child abuse. None.

20). From there, CPS outrageously, at the behest of medical staff, accused Thompson of starving J.T., without one iota of proof – especially when medical staff had just admitted that they could not figure out what was wrong with J.T. And furthermore, literally watch Thompson feed J.T. for days now, from her breast, when staff was not utilizing breast milk provided to them in bottles. CPS, in the face of those unequivocal, irrefutable, basic, not-difficult-to-understand,

straightforward facts, about the sheer impossibility (and absurdity) of Thompson starving J.T.,

begrudgingly left Thompson's room at the direction of Jurnee.

21). Relentless in their insanely egregious and unprofessional behavior, CPS starting texting

Thompson telling her that if she did not answer questions about J.T., and did not do what they

(CPS) said, that CPS would come take custody of all of Thompson children. Thompson ignored

the text from CPS, rightfully. From there, Thompson continued all throughout the rest of the day,

answering questions from the doctors, trying to figure out what happen with J.T.

22). On the fourth day, the same thing occurred. Thompson kept feeding J.T. and trying to

help the doctors figure out what occurred with J.T. With an exception to the one time Thompson

left to let some bottles of milk the second day, she stayed at the hospital, barely slept at all, and

cleaned herself in the bathroom. On that same day, a nurse promised Thompson that she would

keep a close eye on J.T. while she went home to get a change of clothes. She did. Thompson aunt

picked her up, took her to get some clothes, and brought her right back to the hospital.

23).  When bringing Thompson back to the hospital, her aunt, Vickie Mease came back in

with her and stayed for many hours. At this point, the nurses started making statements to

Thompson such as "Don't you have other kids to attend to" "Why are you staying here with your

child" "You're' not contributing to [J.T.'s] health condition by staying" "We're certified children

providers" and "You're hindering our progress with [J.T.]" and "you need to go home"

notwithstanding the fact that Thompson never, at any time, hindered medical staff from

providing care to J.T. Indeed, while medical staff oxymoronically kept telling Thompson to go

home, they persistently asked Thompson questions about information necessary to determine the

scope of his medical condition, while also having Thompson breast feed J.T. (which, in and of

itself, contradicted medical staff's desire for Thompson to leave her son's side at the hospital).

7

24). Thompson kindly declined their offer to go home. She told them that she wanted to stay in close proximity to her child for as long as he was sick.

25). Notwithstanding the fact that staff were repeatedly implying and accusing Thompson of starving J.T., and, even though the nurses had just attempted to get Thompson to go home.... When Thompson told the medical staff that she was staying, they immediately asked Thompson to start pumping more milk for J.T. – which begs the question: why did medical staff want Thompson to go home, if they knew that they needed more milk from her?

26). Up to this point, on day 4, although medical staff had repeatedly accused or implied that J.T. was malnourished because Thompson wasn't feeding him.... Thompson had pumped so much milk out of her breast for J.T. that her nipples were literally hurting. Thompson, nevertheless, embarked on a mission to pump more milk out of her breast for staff, from her dry breast.

27). For the remainder of the day, all of the nurses harbored a negative attitude against Thompson for declining their invitation to go home and leave her child alone.

28). On day five, medical staff and Thompson were still trying to figure out what was going on with J.T., to no avail. This day went without a hitch in relation to Thompson' interaction with the medical staff.

29). On day six, Thompson's aunt came to the hospital to visit her and J.T. Vickie stayed for hours. During the course of that day, in holding conversation with the nurses, they kept accusing or implying that Thompson, somehow, was starving J.T. even though medical staff watched Thompson feed J.T., and also gave J.T. Thompson's breast milk.

8

30). Medical staff also start asking Thompson how is it that she could stay up essentially all night, without any sleep. Again, medical staff told Thompson that she should leave, go home, get some sleep. Thompson, again, kindly declined to leave J.T., her child, in the hospital by himself. After sharing a hamburger and fry with Vickie, at around 8pm, Thompson hit the buzzard and asked the nurses for something to drink. This request was ignored. Vickie left at that time.

31). An hour later, Thompson again, hit the buzzard and asked for something to drink. Again, she was ignored by the medical staff.

32). After another hour passed, Thompson, again, hit the buzzard requesting something to drink. Again, she was ignored.

33). At around 11:30 pm close to 12 am, after repeatedly being ignored her request for a drink, Thompson stepped out into the hall to ask why staff was not bringing her anything to drink. The nurse said that the Charging Nurse, Jackie, had told staff that they were prohibited from bringing Thompson anything to drink.

34). Thompson then called her daughter, Jurnee, explaining what occurred.

35). As a result of that conversation that Jurnee heard, she told Thompson that she was going to come up to the hospital to give her a break, change her clothes, and come back. By the time Jurnee got up to the hospital and tried to utilize her pass card to get it, she figured out that the badge was no longer valid. It was at this point that she called Thompson and told her that she could not get in the hospital. And ask Thompson if she could come down and let her in.

36). Thompson went downstairs to let Jurnee in. When Thompson open the locked door to go out to let Jurnee in, then tried to come back in through the locked door, she realized that her

9

badge did not work anymore either. Thompson was then told by the security guard that the hospital was on lockdown when she inquired about why she wasn't being let back in.

37). Thompson and Jurnee then approached the emergency room office and told staff that Thompson had to go back to her son's room, who was a patient at the hospital. Thompson explained that her card wasn't working, she didn't understand what was going on, her son was crying, his blood sugar was low, and it was time to feed him. All of these requests fell upon deaf ears. It was at this time that both Thompson and Jurnee started recording the events that occurred in the hospital lobby as they interacted with staff in an endeavor to get back to J.T.'s room, or in the alternative, check J.T. out of the hospital to take to a different hospital for a second opinion.

38). Thompson and Jurnee went back and forth with the medical staff for about an hour and a half about not being permitted to go back upstairs with her son, notwithstanding the fact that, up to that point, they never, ever stated why Thompson could not go back upstairs with her son, other than the hospital being locked down.

39). It was at this point that Jurnee, fed up with the shenanigans, called the Omaha Police Department for the purposes of reporting the kidnapping of J.T., Thompson's son.

40). The police arrived 15-20 minutes later. From there, it didn't take any more than several minutes, hearing both sides of the story, for the police officers to arrive at the conclusion that Thompson should surely be permitted to go back upstairs with her child. Indeed, the officers explicitly said that she had a right to be with her son in the hospital based on the explanation about what occurred from both sides.

41). The police officers arrived at this conclusion, that Thompson has the right to go back upstairs in the room with her child because the medical staff candidly admitted that Thompson

10

did nothing illegal; did not threaten or touch staff in any way; and, did not even so much as raise her voice the whole 6 days she was there at the hospital with J.T. The medical staff's only issue with Thompson is that they felt as if she was asking for too much to drink (even though medical staff were compelling her to pump her breast for additional, extra milk for J.T. at an extraordinarily ridiculous level, to the point that Thompson' nipple were literally in pain).

42). The police officers therefore directed medical staff to allow Thompson to go back upstairs with her child. But told Jurnee that, since she's not needed there for any other reason other than to visit, she could leave the premises for now.

43). When Thompson got upstairs, J.T. was unstable, ~~crying~~ very weak and coding. Thompson picked up J.T. and start attending to him, ironically, as directed by the medical staff. Thompson started breast feeding J.T. During the course of doing so, however, three more different police officers appeared in the room. Officers Diminco, Phillips and Boyer. The police officers stepped within 5 feet of Thompson' circumference and stared at her as she breast fed J.T. Notwithstanding the fact that, whatever medical staff called the police, for a second time, surely told them that the medical staff were requesting that a women be removed from the premises.... The Omaha Police Department, nevertheless, sent three men to remove the 130-pound Thomas from Children's hospital, not even sending one woman police officer to the scene.... For no lawful reason.

44). Confused concerning the officers presence, Thompson starting asking why they were there. The officers remained silent. Their presence scared Thompson. She therefore called Jurnee again to tell her about how the officers were sitting in the room, in her personal space, staring at her.

11

45). During the course of conversing with Jurnee, Thompson finished breast feeding J.T. It was at this time that the three officers approached Thompson, telling her to hand over J.T. Thompson respectfully declined. She wanted an explanation as to why she had to give her child to police officers rather than to a nurse. She also continually questioned why the officers were even present. During this time, Thompson was still on the phone with Jurnee.

46). After going back and forth, for several minutes, about the issue, the officers were eventually fed up with Thompson's refusal to hand over her child, notwithstanding the fact that (1) the police are not medical practitioners; (2) the police would not explain why they wanted her to hand her child over to them; (3) the police would not explain why they were in the room; and (4) Thompson had committed no crime, at all, whatsoever.

47). And, as a result of the police officers misguided, irrational frustration at Thompson's reasonable protestations about handing over her child, officers Diminoc and Phillips literally grabbed J.T. and forcefully snatched him out of Thompson's hands, inflicting unwarranted and unnecessary pain upon J.T. who was screaming and hollaring. After doing so, Officers Diminoc and Phillips, two well-built male officers, started  assaulting the 130 pound Thompson alleging that she was somehow "resisting arrest." Thompson was not resisting arrest. She couldn't. The two officers were twice almost three times her size.

48). As part of that assault, the Diminoc and Phillips literally choked, strangled, and elbowed, kneed and punched the 130-pound Thompson in her stomach, ribs, arms, and legs, resulting bruises to all of those areas, before they pinned her to the floor, the side of her face forced flush to the ground, under the hospital bed, by Phillip's forearm, while she was handcuffed by Dominic. The handcuffs were clamped extremely tight around Thompson' wrist. At all relevant

12

times, Thompson persistently asked and stated, exasperated, "Why are you doing this to me?!" "Why am I being arrested?!" "I'm not resisting arrest!"

49). From there, Phillips and Diminoc commenced to manhandle Thompson, dragging her out of the room, still accusing Thompson of somehow having the power to resist arrest, which justified, in their minds, the continuous assault of Thompson by slamming her up against walls, punching her in her ribs and stomach, and stepping on her right foot (and thus causing a injury to that foot and ankle) during the course of literally dragging her down stairs to the first floor, all while Thompson was handcuffed. But it didn't stop there.

50). Thompson was on the phone with Jurnee when the chaos ensured in the hospital room. Jurnee therefore sped back up to the hospital when she heard the police officers starting to ask Thompson to hand over J.T., then, start to assault Thompson.

51). Jurnee was consequently outside in front of the hospital waiting for the police to bring Thompson out of the hospital. Jurnee had her phone camera on ready to film what was occurring when Thompson was bought out of the hospital.

52). And no different than when Thompson was being dragged and assaulted throughout the hospital, Diminco and Phillips continued to assault Thompson, on tape, as Jurnee recorded, protesting her mother's arrest.

53). As can be seen on the video footage, Diminco and Phillips roughly drug the handcuffed 130-pound Thompson to the police cruiser, persistently punching, kneeing and raising her handcuffed hands and arms in painful positions for no other reason than to cause the 130-pound Thompson, who was not resisting arrest, undue pain both physically and psychologically.

54). As can be seen on the video footage, officers Diminco and Phillips then shoved Thompson in the police cruiser and commenced to assault her even further, punching her while Phillips forcefully placed his forearm across Thompson neck so that she could not breath, so that Thompson could stop asking the officers why she was being arrested (as can be heard on the video footage).

55). The Phillips and Diminco committed these egregious acts (as Boyer watched, without interfering) all while Thompson was handcuffed and not resisting arrest. Indeed, she was in no physical 130-pound position to ever resist arrest.

56). Thompson sustained a series of injuries, to her wrist from the handcuffs, and to her hands, arms, legs, ribs, right foot and the inside of her mouth from her face being forcefully pushed to the pavement, all as a result of the assault of the police officers. (Thompson went to another hospital, after she got out of jail, to be treated for her injuries. She also has pictures of all of her injurys, and video footage).

57). Upon arriving at the police department, the officers charged Thompson fingerprinted, photographs, held for more than 5 hours and told that she had been arrested for the unfounded charges of "Obstructing Administration of Law" in violation of Neb.Rev.Stat. Section 20-21; and, "Caretaker Neglect" in violation of Neb.Rev.Stat. Section 20-27.

58). Thompson bonded out of jail several hours later.

59). As time went by, and Thompson secured a different medical opinion concerning J.T.'s condition, J.T. was eventually diagnosed with a Soto's syndrome, a extremely rare medical condition, in addition to a spinal disease and seventeen other ailments that occurred by happenstance, having absolutely nothing to do with J.T. being "malnourished" as medical staff

14

repeatedly asserted, even to the arresting police officers, who inserted that falsehood into their police reports.

60). On February 28, 2022, as a result of a motion filed by the State Prosecutor, the charges of Obstructing Administration of Law and Caretaker Neglect, under Case No. CR 21 10588, were dismissed against Thompson.

## CLAIMS

### COUNT I.
### FALSE ARREST

Pursuant to 42 USC § 1983 , citizens may seek redress for false arrest and pursue violations of their constitutional rights by state or local officials, including police officers.  The statute guarantees that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory ... subjects ... any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[2]  Unconstitutional false arrest is a cognizable claim under 42 USC § 1983, and is in fact one of the most common 42 USC § 1983 claims brought against police officers.[3]

61). Defendants Diminoc , Phillips and Boyer wrongfully and unlawfully arrested and detained and/or assisted in the arrest and detention of the Plaintiffs on the unfounded charge of "Obstruction Administration of Law" and "Caretaker Neglect", even though they knew that no probable cause or any other basis for the charge existed.

---

[2] USC § 1983 applies to state officials; federal officials may be sued under an analogous "Bivens action." *See Bivens v Six Unknown Named Agents* of Federal Bureau of Narcotics, 403 US 388 (1971) (holding that the Fourth Amendment is an affirmative restraint on the conduct of federal officials and authorizing the use of money damages to enforce the restraint.

[3] 42 USC § 1983 (2000).

62). As a direct proximate result of the false arrest of Plaintiffs by the Defendants, Plaintiff White and her minor son suffered discomfort, distress and loss of liberty; and have suffered, and will continue to suffer, mental anguish, humiliation and embarrassment from the indignity and disgrace of being falsely arrested, taken into custody, and otherwise grossly mistreated.

WHEREFORE, Plaintiff Thompson and her son demand judgment against Defendants, jointly and severally, in the full and just amount of Two Million, Five Hundred Thousand Dollars ($2,500,000.00), in compensatory damages, punitive damages against Defendant Cosma, and other Defendants, in the amount of Two Million Dollars ($2,000,000.00) plus interest, costs and attorney's fees to the extent allowed by law.

## COUNT II.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Pursuant to *Nelson v. Dolan, 230 Neb. 848, 434 N.W. 2d 25 (1989)*;  a Claimant may recover for intentional infliction of emotional distress,  with sufficient proof of following: (1) that there has been intentional or reckless conduct, (2) that the conduct was so outrageous  in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. [4]

63). Plaintiff Thompson further alleges that Defendant Police Officers Diminco, Phillips and Boyer, three male officers, with deliberate indifference and reckless disregard for the rights of Plaintiff Thompson and her son and with pure malice, did subject Plaintiff Thompson, a woman, to the humiliation of her son being arbitrarily and forcefully ripped from her arms, and being

---

[4] This court held that a decedent's estate may recover as an element of damages for decedent's conscious pain, suffering, and mental anguish resulting from the apprehension and fear of impending death.  Further, the Court found the reasoning in *Nelson* persuasive and see no reason why it would not also apply in other cases.

16

thrown to the ground, assaulted, handcuffed and being arrested in front of her minor son, and treated as if he were a criminal. Defendants City of Omaha, Douglas County and the Omaha Police Department, with full knowledge of the inappropriateness of these actions have taken no action against any officer involved in the blatantly unfounded arrest of Plaintiff Thompson and and have, therefore, acquiesced in and/or condoned the unlawful acts of Defendants Diminco, Phillips and Boyer against Plaintiff.

64). As a direct and proximate result of the actions of Defendants, Plaintiffs suffered discomfort, distress and loss of liberty; and has suffered, and will continue to suffer, psychological harm and mental anguish including fright, shame, mortification, humiliation and embarrassment from the indignity and disgrace of being unlawfully arrested, taken into custody, and otherwise grossly mistreated.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in the full and just amount of One Million, Five Hundred Thousand Dollars ($2,500,000.00), in compensatory damages, punitive damages against Defendants Diminco, Phillips and Boyer in the amount of Two Million Dollars ($2,000,000.00) plus interest, costs and attorney's fees to the extent allowed by law.

## COUNT III.

## NEGLIGENT SUPERVISION

Courts have held that as a general rule, employers have a duty to exercise reasonable care "to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee," which extends to "members of the public who would reasonably be expected to come into contact" with the employee. The measure of reasonable care is what a person of ordinary prudence would do in view of the nature of the employment and the

consequences of employing an incompetent or dangerous individual and there is no requirement

that an individual be found liable in his individual capacity before that individual or anyone else

may be found liable in their official capacity. Brandon et. al. v. Holt, Director of Police for City

of Memphis, 469 U.S. at 469, 105 S.Ct. at 876-77. [5]

65). On June 9, 2021, Defendants Diminco, Phillips and Boyer were acting under the

direction and control, and pursuant to the rules, regulations, policies and procedures, of

Defendants City of Omaha, Douglas County.

66). Defendants City of Omaha, Douglas County acted negligently, carelessly

and recklessly by failing to properly train, supervise, control, direct and monitor Defendants

Diminco, Phillips and Boyer, particularly as it relates to accosting and the arrest of purported

women suspects.

67). As a direct and proximate result of the acts and omissions of Defendants City of

Omaha, Douglas County, Plaintiff Thompson and her minor son were wrongfully and

unlawfully, seized, arrested, detained and humiliated. As a result, Plaintiff Thompson and her

son have suffered physical assault, embarrassment, and mental anguish.

WHEREFORE, Plaintiffs demands judgment against Defendants City of Omaha, Douglas

County, jointly and severally, in the full and just amount of Two Million, Five Hundred

Thousand Dollars ($2,500,000.00), in compensatory damages, plus interest, costs and attorney's

fees to the extent allowed by law.

---

[5] In Brandon, the court stated that in other recent cases arising under § 1983, we have plainly implied that a judgment against a public servant "in his official capacity" imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond.

## COUNT IV.

### ASSAULT AND BATTERY - EXCESSIVE USE OF FORCE

Pursuant to the law in the State  a police officer in making an arrest must use only

reasonable force, which is that amount of force which an ordinary, prudent, and intelligent

person with the knowledge and in the situation of the arresting police officer would have deemed

necessary under the circumstances.   *State v. Thompson*, 244 Neb. 189, 505 N.W.2d 673 (1993).[6]

68). Defendants Diminco, Phillips and Boyer, without proper grounds, willfully assaulted and

handcuffed Plaintiff Thompson, and assaulted her and her minor son without just cause or basis.

69). As a direct and proximate result of Defendants' willful, malicious and intentional

conduct, Plaintiff Thompson and her minor son suffered bodily injuries when Thompson's minor

son was ripped from her arms, and Thompson was beat to the ground, handcuffed, and assaulted

continuously until she was placed in the police cruiser.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally,

in the full and just amount of Two Million, Five Hundred Thousand Dollars ($2,500,000.00), in

compensatory damages, punitive damages against the Defendants in the amount of Two

Million Dollars ($2,000,000.00) plus interest, costs and attorney's fees to the extent allowed by

law.

---

[6] Pursuant to Neb. Rev. Stat. §28-1412,  a police officer in making an arrest must use only reasonable force, which is
that amount of force which an ordinary, prudent, and intelligent person with the knowledge and in the situation of
the arresting officer would have deemed necessary under the circumstances. *Wagner v. City of Omaha*, 236 Neb.
843, 464 N.W.2d 175 (1991*), State v. Thomas*, 244 Neb. 189, 505 N.W. 2d 673 (1993).

## COUNT V.

### DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

70). Plaintiff White further alleges that Defendants Diminco, Phillips and Boyer, with deliberate indifference and reckless disregard for the safety and wellbeing of her and her minor son and in violation of the Fourth Amendment to the Constitution, did on August 13, 2014 deprive Plaintiff White and her son of their Constitutional rights by assaulting them and then placing them under unlawful arrest, or failed to prevent the arrest and detention, when they had the opportunity to do so.

71). The arrest and detention were and are in violation of Plaintiffs' right to be free from unreasonable seizure secured by the Fourth Amendments to the United States Constitution and protected under 42U.S.C.§1983.

72). As a direct and proximate result of Defendants' arrest and detention of Plaintiffs as set forth herein, Plaintiffs have suffered severe emotional anguish.

WHEREFORE, Plaintiffs demand judgment against Defendants Diminco, Phillips and Boyer, jointly and severally, in the full and fair amount of Two Million Dollars ($2,000,000.00) in compensatory and punitive damages, plus interest, costs and attorney's fees to the extent allowed by law.

## COUNT VI.

## FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE 42 U.S.C. § 1983

Complainants seeking to impose § 1983 liability on local governments must prove that their injury was caused by "action pursuant to official municipal policy," which includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. [7]

73). On June 9, 2021, Defendants that were responsible for the arrest of Plaintiff Thompson and the assault of her minor son were acting under the direction and control, and pursuant to the practices and customs of Defendants City of Omaha, Douglas County and implemented by Defendant Todd Schmaderer.

74). Defendant acted negligently, carelessly, recklessly and with deliberate indifference to Plaintiffs by failing to properly train, supervise, control, direct, monitor and discipline Defendant officers from their respective departments who were patrolling the streets of Ferguson, Missouri during the period of June 9, 2021.

75). As a direct and proximate result of the acts and omissions of Defendants City of Omaha, Douglas County and Tod Schmaderer, Plaintiff Thompson and her minor son were Unlawfully seized, arrested, and otherwise deprived of their rights under the Fourth Amendment to the U.S. Constitution.

---

[7] *Monell* court fond local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for § 1983 purposes. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611.

WHEREFORE, Plaintiff demand judgment against Defendants, jointly and severally, in the full and just amount of Two Million Dollars ($2,000,00.00), plus punitive damages to the extent allowed by law, attorney's fees, interest, and costs.

Executed on this _7_ day of  June, 2023

Respectfully Submitted,

/s/ Jacara Thompson
1215 N. 35th Street
Omaha, NE 68131

## **VERIFICATION**

I, Jacara Thompson, hereby depose and state, under the pains and penalties of perjury, that the forgoing is true and correct to the best of my knowledge.

Jacara Thompson

SUBSCRIBE AND SWORN TO by me, a notary public in the State of Nebraska, on this _5th_ Day of June, 2023.

GENERAL NOTARY - State of Nebraska
ACHOL B BOL
My Comm. Exp. July 26, 2026

Notary Signature                                         Notary Seal