IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JACARA THOMPSON, on her own behalf
and on behalf of her minor son J.T.;

               Plaintiff,

       vs.

TODD SCHMADERER, individually, And in
his official capacity as City of Omaha,
Nebraska Chief of Police; BRIAN DIMINCO,
(Shield No. 1988), individually and his official
capacity as City of Omaha Police Officer;
OFFICER TYLER BOYER, (Shield No.
2458), individually and his official capacity as
City of Omaha Police Officer;  OFFICER
PHILLIPS, (Shield No. 2452), individually
and his official capacity as City of Omaha
Police Officer; and  CITY OF OMAHA,
NEBRASKA, DOUGLAS COUNTY,

               Defendants.

**8:23CV245**

**MEMORANDUM AND ORDER**

Plaintiff Jacara Thompson ("Thompson" or "Plaintiff") filed a Complaint, Filing No. 1, and has been given leave to proceed in forma pauperis.  Filing No. 5.  The Court now conducts an initial review of Plaintiff's claims to determine whether summary dismissal is appropriate under 28 U.S.C. § 1915(e)(2).

## I.  SUMMARY OF COMPLAINT

Thompson brings this action under 42 U.S.C. § 1983 against the City of Omaha, Omaha Police Chief Todd Schmaderer ("Schmaderer"), and Omaha Police Department ("OPD") officers Brian Diminco ("Diminco"),[1] Tyler Boyer ("Boyer"), and Phillips ("Phillips") (collectively "Defendants") in their individual and official capacities, seeking damages for

---

[1] Thompson sometimes refers to Diminco as "Diminoc" within the Complaint.  *See, e.g.,* Filing No. 1 at 12, ¶ 47.  The Court will refer to this Defendant as Diminco throughout this Memorandum and Order.

violations of her rights under the Fourth Amendment arising out of Thompson's arrest in June 2021.

On June 9, 2021, Thompson, an African-American woman, took her minor son, J.T., to Children's Hospital located at 8316 North 30th Street in Omaha, Nebraska "because her son had, among other things, lost an extraordinary amount of weight" and was "smaller than when he was born." Filing No. 1 at 4, ¶ 10. Thompson had previously taken her son to the hospital, "to no avail," and received no answers about his condition "for five and a half months straight." *Id*. Thompson was directed to take J.T. to Children's Hospital[2] and, on that same day, J.T. was checked into CHI Health Clinic Family Medicine located at 8200 Dodge Street. After waiting several hours, the hospital provided a bed for J.T.

Over the course of the following six days while J.T. was in the hospital, nursing staff "kept implying that Thompson was not feeding J.T., notwithstanding the fact that Thompson was persistently, every two hours, breast feeding J.T. since she had been there—and before she had arrived, essentially since J.T.'s birth." *Id*. at 5, ¶ 15. Staff continued to accuse Thompson of "starving her child" while at the same time demanding Thompson provide more breast milk, which Thompson did by pumping breast milk. *Id*. at 6, ¶ 17. Thompson also provided staff with bottles of breast milk that she already had prepared.

On the third day of J.T.'s hospitalization, doctors told Thompson that they could not figure out what was wrong with J.T. and said it "has to be something [in]ternal." *Id*., ¶

---

[2] It is apparent from the context of Plaintiff's allegations that this "Children's Hospital" is an actual hospital and a different facility than the first Children's Hospital referenced, which the Court assumes is a medical clinic, as opposed to a hospital.

19.   However, Child Protective Services ("CPS") came to the hospital room to talk to Thompson at the direction of Children's Hospital's medical staff.  Thompson's daughter, Jurnee, was present when CPS came and directed them to leave the room as they had no authority to speak to Thompson "because there was absolutely positively no proof of child abuse."  *Id.*  When presented with the facts that medical staff had admitted that they could not figure out what was wrong with J.T. and had watched Thompson feed J.T. breast milk for days, CPS "begrudgingly left Thompson's room at the direction of Jurnee." *Id.* at 6–7, ¶ 20.

Thompson only left the hospital twice—once on the second day to get some bottles and once on the fourth day to get a change of clothes.  After Thompson returned on the fourth day, nurses started telling Thompson that she should go home and care for her other children because she was "hindering [their] progress with J.T.," though Thompson never hindered medical staff in providing care for J.T. and was "persistently asked . . . questions about information necessary to determine the scope of his medical condition" and asked to breastfeed J.T.  *Id.* at 7, ¶ 23.  "Thompson . . . kindly declined to leave J.T., her child, in the hospital by himself."  *Id.* at 9, ¶ 30.  Despite Thompson continually feeding J.T. and pumping breast milk to the point it was painful, medical staff continued to insinuate that J.T. was malnourished because Thompson was not feeding him. Thompson's interactions with staff continued in the same manner through the fifth and sixth days of J.T.'s hospitalization.

Beginning around 8 p.m. on the sixth day, which would be on or about June 14, 2021, and continuing until close to midnight, Thompson made multiple requests to the nurses for something to drink, but her requests were ignored, despite the nurses asking

3

Thompson to continue to pump breast milk.  *Id.*, ¶¶ 30–33.  Upon inquiry, Thompson was informed the Charging Nurse had prohibited staff from bringing Thompson anything to drink.

Thompson called her daughter, Jurnee, to explain what happened, and Jurnee came to the hospital to give Thompson a break so she could leave, change her clothes, and come back.  When Jurnee arrived, she was unable to enter the hospital using her pass card so Thompson went downstairs to let Jurnee into the hospital.  After Thompson exited the hospital to let Jurnee inside, she was unable to return through the locked door and realized her badge no longer worked.  Thompson was told by a security guard that the hospital was on lockdown when she asked why she could not get back inside.  Thompson and Jurnee then attempted to re-enter the hospital through the emergency room office, but staff would not permit them  to enter even after Thompson explained that her son was a patient and she had to get back to his room or, alternatively, check him out and take him to a different hospital to get a second opinion.  *Id.* at 9–10, ¶¶ 34–37.

After an hour and a half of Thompson going "back and forth with the medical staff . . . about not being permitted to go back upstairs with her son," Jurnee called the OPD to report "the kidnapping of J.T."  *Id.* at 10, ¶ 39.  Police officers arrived within twenty minutes and, after hearing both sides of the story, concluded that Thompson had a right to be with her son in the hospital "because the medical staff candidly admitted that Thompson did nothing illegal; did not threaten or touch staff in any way; and[] did not even so much as raise her voice the whole 6 days she was there at the hospital with J.T.  The medical staff's only issue with Thompson is that they felt as if she was asking for too much to drink."  *Id.* at 10–11, ¶ 41.  The police officers then directed hospital staff to allow

Thompson to go upstairs to be with her child but advised Jurnee she should leave the premises since she was only visiting.

When Thompson returned to J.T.'s room, "J.T. was unstable, very weak and coding." *Id.* at 11, ¶ 43.  Thompson picked up J.T. and began attending to him as directed by medical staff.  While Thompson was breastfeeding J.T., Officers Diminco, Phillips, and Boyer entered the room and stood "within 5 feet of Thompson[] . . . and stared at her as she breast fed J.T." *Id.*  Confused and scared by the officers' presence, Thompson asked why they were there and, receiving no reply, called Jurnee to tell her what was happening.  When Thompson finished breast feeding J.T., the officers approached her and told her to "hand over J.T.," which "Thompson respectfully declined." *Id.* at 12, ¶ 45.  Thompson "wanted an explanation as to why she had to give her child to police officers rather than to a nurse" and "also continually questioned why the officers were even present.  During this time, Thompson was still on the phone with Jurnee." *Id.*

After several minutes in which the officers refused to answer Thompson's questions, "the officers were eventually fed up with Thompson's refusal to hand over her child," and "officers Diminco and Phillips literally grabbed J.T. and forcefully snatched him out of Thompson's hands, inflicting unwarranted and unnecessary pain upon J.T. who was screaming and holl[e]ring." *Id.*, ¶¶ 46–47.  "After doing so, Officers Diminco and Phillips, two well-built male officers, started assaulting the 130 pound Thompson alleging that she was somehow 'resisting arrest.'" *Id.*, ¶ 47.  Thompson denies she was resisting arrest as she was physically unable to do so due to Diminco's and Phillips' much larger stature.  Diminco and Phillips "choked, strangled, and elbowed, kneed and punched the 130-pound Thompson in her stomach, ribs, arms, and legs, resulting [in] bruises to all of

those areas." *Id.*, ¶ 48.  The two officers then "pinned her to the floor, the side of her face forced flush to the ground, under the hospital bed, by Phillip's forearm, while she was handcuffed by Diminco," who placed the handcuffs "extremely tight[ly] around Thompson'[s] wrist." *Id.*

Phillips and Diminco then drug Thompson out of the room and continued the "assault of Thompson by slamming her up against walls, punching her in her ribs and stomach, and stepping on her right foot (and thus causing a[n] injury to that foot and ankle) during the course of literally dragging her down stairs to the first floor, all while Thompson was handcuffed." *Id.* at 13, ¶ 49.  When the officers brought Thompson out of the hospital, Jurnee was waiting outside as she had come back to the hospital after hearing over the phone "the chaos [that] ensued in the hospital room," and she filmed what was occurring on her phone's camera.  *Id.*, ¶¶ 50–51 (spelling corrected). Thompson alleges the video footage shows "officers Diminco and Phillips then shoved Thompson in the police cruiser and commenced to assault her even further, punching her while Phillips forcefully placed his forearm across Thompson['s] neck so that she could not breath, so that Thompson could stop asking the officers why she was being arrested." *Id.* at 14, ¶ 54.  Officer Boyer watched this happen, "without interfering."  *Id.*, ¶ 55.

The OPD officers took Thompson to the police department where she was held for over five hours and told that she had been arrested for "'Obstructing Administration of Law' in violation of Neb.Rev.Stat. Section 20-21; and 'Caretaker Neglect' in violation of Neb.Rev.Stat. Section 20-27." *Id.*, ¶ 57 (punctuation corrected).  "Thompson bonded out of jail several hours later." *Id.*, ¶ 58.  Thompson "sustained a series of injuries, to her wrist from the handcuffs, and to her hands, arms, legs, ribs, right foot and the inside of

her mouth from her face being forcefully pushed to the pavement," for which she sought treatment at another hospital after her release from jail.  *Id.*, ¶ 56.

Thompson later secured a different medical opinion concerning J.T.'s condition, and he "was eventually diagnosed with a [sic] Soto's syndrome, a[n] extremely rare medical condition, in addition to a spinal disease and seventeen other ailments that occurred by happenstance, having absolutely nothing to do with J.T. being 'malnourished' as medical staff repeatedly asserted."  *Id.* at 14–15, ¶ 59.  On February 28, 2022, the State Prosecutor dismissed the charges of Obstructing Administration of Law and Caretaker Neglect, under Case No. CR 21 10588, against Thompson.  *Id.* at 15, ¶ 60.

## II.  APPLICABLE STANDARDS ON INITIAL REVIEW

The Court is required to review in forma pauperis complaints to determine whether summary dismissal is appropriate.  *See* 28 U.S.C. § 1915(e).  The Court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B).

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'"  *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)).  Plaintiffs must set forth enough factual allegations to "nudge[ ] their claims across the line from conceivable to plausible," or "their complaint must be dismissed."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the

7

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"A pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted). This means that "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Stone v. Harry,* 364 F.3d 912, 915 (8th Cir. 2004). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980).

### III.  DISCUSSION

Liberally construed, Thompson asserts claims for violations of her Fourth Amendment rights under 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the United States Constitution or created by federal statute, and also must show that the alleged deprivation was caused by conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A.  The Parties

As a preliminary matter, the Court addresses issues with the named parties to this action. First, according to the caption of the Complaint, this action is purportedly brought by Thompson "on her own behalf and on behalf of her minor son J.T." Filing No. 1 at 1. Thompson is proceeding pro se, and, as a pro se litigant, she may not represent the interests of other parties, including her son, J.T. *Litschewski v. Dooley*, No. 11-4105-RAL, 2012 WL 3023249, at *1 n. 1 (D.S.D. July 24, 2012), *aff'd*, 502 Fed.Appx. 630 (8th

8

Cir. 2013).  Indeed, "[n]on-attorney parents cannot litigate *pro se* on behalf of their minor children, even if the minors cannot then bring the claim themselves."  *Crozier for A.C. v. Westside Community School District*, 973 F.3d 882, 887 (8th Cir. 2020).  "While this rule 'may not be ironclad,' there is no exception for lawsuits based on 42 U.S.C. § 1983 or general state tort law."  *C.H. by & through Hunt v. Pattonville Sch. Dist.*, No. 4:21-CV-00443-JCH, 2021 WL 4061106, at *2 (E.D. Mo. Sept. 7, 2021) (quoting *Crozier for A.C.*, *supra*).  Accordingly, the Court will dismiss any claims brought on J.T.'s behalf without prejudice to reassertion should counsel be obtained to represent J.T.

Second, Thompson named the "City of Omaha, Nebraska, Douglas County" as a defendant in this action, Filing No. 1 at 1, but the Complaint is unclear as to whether Thompson seeks to sue only the City of Omaha (the "City"), which is located within Douglas County, Nebraska, or whether Thompson seeks to sue the City of Omaha and Douglas County (the "County") as two distinct entities.  *See, e.g.*, *Id.* at 2, ¶ 1 (concluding list of parties with "Douglas County, Nebraska; The City of Omaha ("Defendants")).  For purposes of this initial review, the Court construes Thompson's claims as being raised against the City only as there are no factual allegations in the Complaint suggesting that any of the officers involved in the alleged violation of Thompson's constitutional rights were associated with or employed by the County.

Finally, Thompson alleges in the Complaint's introduction that this is a civil action for damages against Defendants and includes "the John Doe police officers of OPD" as defendants.  *Id.*, ¶ 1.  Thompson also lists the John Doe officers in Section III of her Complaint where she identifies the parties.  *Id.* at 4, ¶ 8.  "'[A]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to

permit the identity of the party to be ascertained after reasonable discovery.'" *Perez v. Does 1-10*, 931 F.3d 641, 646 (8th Cir. 2019) (quoting *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).  However, the allegations in Thompson's Complaint regarding these unknown, unnamed John Doe OPD officers are not sufficiently specific to satisfy the exception to the general prohibition against fictitious parties.  *See id.*  The Complaint "does not sufficiently allege who the Doe Defendants are, what they allegedly did, what their position is for the City, or any other facts that would permit [them] to be noticed or identified through discovery."  *Id.*  Furthermore, "[t]o prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation," *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017), and Thompson makes no allegations whatsoever about the John Doe officers' involvement in any alleged unconstitutional conduct.  Accordingly, any claims against the John Doe officers are dismissed without prejudice for failure to state a claim for relief against them.  *See Krych v. Hvass*, 83 Fed.Appx. 854, 855 (8th Cir. 2003) (holding court properly dismissed claims against defendants where pro se complaint was silent as to the defendants except for their names appearing in the caption).

**B.  Individual Capacity Claims**

Liberally construed, Thompson's allegations raise claims of false arrest, excessive force, and failure to protect under the Fourth Amendment against Diminco, Phillips, and Boyer in their individual capacities.  Thompson also seeks to hold Schmaderer liable in his individual capacity for failure to train or supervise the officers.  "To prevail on a § 1983 [individual-capacity] claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation."  *Torres v. City of St. Louis*, 39 F.4th 494, 504 (8th

Cir. 2022) (quoting *White*, 865 F.3d at 1081).   "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Faulk v. City of St. Louis*, 30 F.4th 739, 744 (8th Cir. 2022) (quoting *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)).

### 1. *False Arrest*

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010) (internal quotation marks and citation omitted).  "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (internal quotation marks and citation omitted).  "To determine the existence of probable cause, we look at the totality of the circumstances as set forth in the information available to the officers at the time of arrest." *Id.* (internal quotation marks and citation omitted).

Construing Thompson's allegations liberally, the Court concludes that Thompson has stated a plausible claim of wrongful arrest in violation of the Fourth Amendment because it is unclear what offense Thompson committed or what facts and circumstances existed that could have reasonably led Diminco, Phillips, and Boyer to believe she committed an offense at the time of her arrest.  Accordingly, this claim will proceed to service of process against the OPD officers in their individual capacities. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017) (plaintiff alleging arrest without probable cause could bring claim for wrongful arrest under Fourth Amendment).

### 2. *Excessive Force*

"An excessive force claim 'is governed by the Fourth Amendment's prohibition against unreasonable seizures,'" *Thompson v. Dill*, 930 F.3d 1008, 1013 (8th Cir. 2019) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)), and "is evaluated under the reasonableness standard of the Fourth Amendment." *Coker v. Arkansas State Police*, 734 F.3d 838, 842 (8th Cir. 2013) (internal quotation and citation omitted). To show a Fourth Amendment violation by the use of force, a plaintiff must establish (1) that she was "seized"[3] within the meaning of the Fourth Amendment and (2) that an officer's use of force was objectively unreasonable given the facts and circumstances of the incident as "judged from the perspective of a reasonable officer on the scene." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (internal quotation and citation omitted); *see also Atkinson v. City of Mountain View*, 709 F.3d 1201, 1209 (8th Cir. 2013).

"Objective unreasonableness is 'judged from the perspective of a reasonable officer on the scene,' in light of 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court may also consider the result of the force. *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 581 (8th

---

[3] To constitute a "seizure" under the Fourth Amendment, there must be a willful or intentional application of physical force, as determined by the "officer's objective behavior," or the plaintiff's submission to the police officer's show of authority. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1208 (8th Cir. 2013). A seizure must "restrain[ ] . . . freedom of movement," but the "restraint need not actually succeed in stopping or holding [the person] even for an instant." *Id.* (internal quotations, alterations, and citations omitted) (police officer's "bull rush" at plaintiff was "more than enough physical force to effect a seizure under the Fourth Amendment" (citing cases)).

Cir. 2009). "Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat." *Wilson*, 901 F.3d at 989 (citing *Smith*, 586 F.3d at 581).

Based on the allegations of Thompson's Complaint, the Court concludes she has stated an excessive force claim against Diminco and Phillips, and such claim will proceed to service of process against these two defendants in their individual capacities.

### 3.  Failure to Protect

As to defendant Boyer, Thompson alleges he failed to act to prevent the unconstitutional infliction of force by officers Diminco and Phillips. "[A]n officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment" when "'(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)). "[A]n officer may be liable for failing to intervene to prevent another officer's use of excessive force against a subject, [but] such liability is contingent upon, among other things, the primary officer using excessive force in the first place." *Mortensbak v. Butler*, 102 F. Supp. 3d 1085, 1099 (D.S.D. 2015); *see also Farrington v. Smith*, 707 F.3d 963, 972 (8th Cir. 2013) (same); *Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011) (same).

Thompson specifically alleges that Boyer witnessed Diminco's and Phillips' use of force "without interfering" and "failed to prevent the arrest and detention." Filing No. 1 at

14, ¶ 55; *Id.* at 20, ¶ 70.[4]  This is sufficient to allege a failure-to-protect claim against Boyer in his individual capacity, and such claim will proceed to service of process.

### 4.  Schmaderer's Failure to Train or Supervise

Thompson appears to seek to impose liability on Defendant Schmaderer based on his supervisory position as Chief of the OPD.  "Supervisors . . . cannot be held vicariously liable under § 1983 for the actions of a subordinate.  To state a claim, the plaintiff must plead that the supervising official, through his own individual actions, has violated the Constitution." *L.L. Nelson Enterprises, Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 810 (8th Cir. 2012) (citations omitted).  "[A] supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1031 (8th Cir. 2012) (quoting *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)).

Here, Thompson alleges "[o]n June 9, 2021, Defendants that were responsible for the arrest of Plaintiff Thompson and the assault of her minor son were acting under the direction and control, and pursuant to the practices and customs of Defendants City of Omaha, Douglas County and implemented by Defendant Todd Schmaderer." Filing No. 1 at 21, ¶ 73.  Liberally construed, Thompson also alleges that the directions, policies, practices, or customs of the City implemented by Schmaderer are deficient "particularly as [they] relate[] to accosting and the arrest of purported women suspects," *Id.* at 18, ¶ 66, and Schmaderer "acted negligently, carelessly, recklessly and with deliberate

---

[4] In Count V of the Complaint where Thompson alleges her Fourth Amendment excessive force claim, the Court notes Thompson mistakenly refers to "Plaintiff White" and an incorrect arrest date of "August 13, 2014." Filing No. 1 at 20, ¶ 70.  These errors appear to be inadvertent typographical errors.  Regardless, the Complaint's factual allegations sufficiently state a claim under the Fourth Amendment.

indifference to Plaintiff[] by failing to properly train, supervise, control, direct, monitor and discipline Defendant officers . . . during the period of June 9, 2021" resulting in the deprivation of Thompson's rights.[5] *Id.* at 21, ¶¶ 74–75.

Broadly construing Thompson's Complaint, the Court concludes that Plaintiff has stated a Fourth Amendment claim for relief against Schmaderer in his individual capacity.

## C. Official Capacity Claims

Thompson's claims against the City of Omaha and Defendants Schmaderer, Diminco, Phillips, and Boyer in their official capacities are actually claims against the City of Omaha itself. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."); *Parrish v. Luckie*, 963 F.2d 201, 203 n.1 (8th Cir. 1992) ("Suits against persons in their official capacity are just another method of filing suit against the entity. A plaintiff seeking damages in an official-capacity suit is seeking a judgment against the entity." (citation omitted)). Because the City of Omaha has been named as a Defendant in the Complaint, all official-capacity claims against Schmaderer, Diminco, Boyer, and Phillips will be dismissed as duplicative of Thompson's claims against the City. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (proper to dismiss claims against city police officer sued in official capacity as redundant of claims against city); *Eagle v. Morgan*, 88 F.3d 620, 629 n.5 (8th Cir. 1996) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (quoting

---

[5] Count VI of the Complaint mistakenly includes language alleging Schmaderer failed to properly train, supervise, control, direct, monitor, and discipline the Defendant officers "from their respective departments who were patrolling the streets of Ferguson, Missouri during the period of June 9, 2021." Filing No. 1 at 21, ¶ 74. Again, this appears to be an inadvertent error on Thompson's part and does not change the Court's analysis given the liberal construction afforded pro se litigants' pleadings.

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985)); *Jackson-Mackay v. Cotant*, No. 8:22CV10, 2022 WL 4448684, at *3 (D. Neb. Sept. 23, 2022) (dismissing official-capacity claims against county employees where county was named as a defendant); *Villarreal v. Schmaderer*, No. 8:20CV403, 2021 WL 2444276, at *3 (D. Neb. June 15, 2021) (dismissing official-capacity claims against police officers where the municipality was also named as defendant).

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality like the City of Omaha can be liable under 42 U.S.C. § 1983 if an "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. To prevail on a claim alleged against the City of Omaha, Plaintiff must show that the constitutional violation resulted from (1) an official "policy," (2) an unofficial "custom," or (3) a deliberately indifferent failure to train or supervise. *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016). Here, Thompson alleges that the City's policies, customs, training, and supervision "particularly as [they] relate[] to accosting and the arrest of purported women suspects" caused a constitutional deprivation. Filing No. 1 at 18, ¶ 66.

"Official policy involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 645 (8th Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

> Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or

16

tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation."

*Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) (quoting *Corwin*, 829 F.3d at 699–700). A municipal-liability claim based on a theory of inadequate training or supervision is simply an extension of a claim based on a "policy" or "custom" theory of municipal liability. *Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018).

As the Eighth Circuit has explained,

When a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right. Moreover, such a holding would disregard the liberality of Fed. R. Civ. P. 8(a)(2) which requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief," and 8(f), which states "pleadings shall be so construed as to do substantial justice." Thus, the failure . . . to specifically plead the existence of an unconstitutional policy or custom, in itself, is not fatal to [a plaintiff's] claim for relief.

*Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). However, a plaintiff's "failure to include any 'allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom' renders the complaint deficient." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (quoting *Doe*, 340 F.3d at 614).

Liberally construing the Complaint, and recognizing that Thompson "need not set forth with specificity the existence of an unconstitutional policy or custom at the pleading stage," *Villarreal*, 2021 WL 2444276, at *4 (internal quotation marks and citation omitted), the Court concludes that the Complaint alleges facts suggesting Thompson was deprived

17

of her constitutional rights and injured as a result of the City's deficient policies with respect to the seizure and arrest of female suspects.

**D.  State Law Claims**

Thompson alleges various state law claims against Defendants including intentional infliction of emotional distress, negligent supervision, and assault and battery. Filing No. 1 at 16–19 (Counts II, III, and IV).  At this time, the Court makes no finding with respect to its jurisdiction over these claims or whether they state a claim upon which relief may be granted.  In order to ensure a just and fair resolution of this matter, Thompson's state law claims will be allowed to proceed to service of process against Defendants along with the Fourth Amendment claims detailed above.

## IV.  OTHER PENDING MOTIONS

On July 18, 2023, Thompson submitted a letter which the Court docketed as a motion for summons.  Filing No. 6.  Thompson asks that the U.S. Marshal serve Defendants under Federal Rule of Civil Procedure 4(c)(3) since she has been granted leave to proceed in forma pauperis.  Based on the foregoing, Thompson's motion for summons is granted, and this matter shall proceed to service of process in accordance with this Memorandum and Order as more specifically set forth below.

## V.  CONCLUSION

Liberally construed, Thompson's Complaint alleges plausible Fourth Amendment false arrest, excessive force, and failure to protect claims against Diminco, Phillips, and Boyer in their individual capacities, as well as a plausible claim for failure to train or supervise against Schmaderer in his individual capacity.  The Court further concludes that the Complaint states a claim for relief against the City of Omaha.  However, the Court

cautions Thompson that these conclusions reached in this initial review are only preliminary determinations based solely on the allegations in the Complaint. This is not a determination of the merits of Thompson's claims or potential defenses thereto. This matter will proceed to service of process on Thompson's § 1983 claims as set forth below, along with her state law claims against Defendants.

IT IS THEREFORE ORDERED that:

1.      The following claims and parties will be dismissed or proceed further as described below:

       a.      Plaintiff's claims brought on behalf of her minor son, J.T., are dismissed without prejudice.

       b.      Plaintiff's claims against defendant "the John Doe police officers of OPD" are dismissed without prejudice and without leave to amend.

       c.      Plaintiff's Fourth Amendment false arrest claim may proceed to service of process against Defendants Diminco, Phillips, and Boyer in their individual capacities.

       d.      Plaintiff's Fourth Amendment excessive force claim may proceed to service of process against Defendants Diminco and Phillips in their individual capacities.

       e.      Plaintiff's Fourth Amendment failure to protect claim may proceed to service of process against Defendant Boyer in his individual capacity.

      f.      Plaintiff's failure to train or supervise claim under 42 U.S.C. § 1983 may proceed to service of process against Defendant Schmaderer in his individual capacity.

      g.      Plaintiff's claims under 42 U.S.C. § 1983 may proceed to service of process against Defendant City of Omaha.

      h.      Plaintiff's state law claims against Defendants may proceed to service of process.

      i.      Plaintiff's claims against Defendants Schmaderer, Diminco, Phillips, and Boyer in their official capacities are dismissed without prejudice as duplicative of Plaintiff's claims against the City of Omaha.

2.      Plaintiff's motion for summons, Filing No. 6, is granted consistent with this Memorandum and Order.

3.      For service of process on Defendants Todd Schmaderer, Brian Diminco (Shield No. 1988), Officer Tyler Boyer (Shield No. 2458), and Officer Phillips (Shield No. 2452) in their individual capacities, the Clerk of Court is directed to complete a summons form and a USM-285 form for such Defendants using the address "Omaha Police Department, 505 S. 15th St., Omaha, Nebraska 68102" and forward them together with a copy of the Complaint, Filing No. 1, and a copy of this Memorandum and Order to the United States Marshals Service.  The Marshals Service shall serve Defendants Todd Schmaderer, Brian Diminco (Shield No. 1988), Officer Tyler Boyer (Shield No. 2458), and Officer Phillips (Shield No. 2452) at Omaha Police Department, 505 S. 15th St., Omaha, Nebraska 68102 by certified mail or by using any of the other following authorized

methods: personal, residence, or designated delivery service.  *See* Federal Rule of Civil Procedure 4(e); Neb. Rev. Stat. § 25-508.01.

4.      For service of process on Defendant City of Omaha, the Clerk of Court is directed to complete a summons form and a USM-285 form for such Defendant using the address "City of Omaha, Attn: City Clerk, 1819 Farnam Street, Omaha NE 68183" and forward them together with a copy of the Complaint, Filing No. 1, and a copy of this Memorandum and Order to the United States Marshals Service.  The Marshals Service shall serve Defendant City of Omaha at City of Omaha, Attn: City Clerk, 1819 Farnam Street, Omaha NE 68183.  Service may be accomplished by using any of the following methods: personal, residence, certified mail, or designated delivery service upon the chief executive officer or clerk of the City of Omaha.  *See* Federal Rule of Civil Procedure 4(j)(2); Neb. Rev. Stat. § 25-510.02.

5.      The United States Marshal shall serve all process in this case without prepayment of fees from Plaintiff.[6]

6.      Federal Rule of Civil Procedure 4(m) requires service of the complaint on a defendant within 90 days of filing the complaint.  However, Plaintiff is granted, on the Court's own motion, an extension of time until 90 days from the date of this order to complete service of process.

7.      Plaintiff is hereby notified that failure to obtain service of process on the Defendants within 90 days of the date of this order may result in dismissal of this matter

---

[6] Pro se litigants proceeding in forma pauperis are entitled to rely on service by the United States Marshals Service. *Wright v. First Student, Inc.*, 710 F.3d 782, 783 (8th Cir. 2013).  Pursuant to 28 U.S.C. § 1915(d), in an in forma pauperis case, "[t]he officers of the court shall issue and serve all process, and perform all duties in such cases."  *See Moore v. Jackson*, 123 F.3d 1082, 1085 (8th Cir. 1997) (language in § 1915(d) is compulsory).

without further notice.  A defendant has 21 days after receipt of the summons to answer or otherwise respond to a complaint.

8.     The Clerk of Court is directed to set a case management deadline in this case with the following text: **November 20, 2023**: service of process to be completed.

9.     The Clerk of Court is further directed to update the caption to indicate that Defendants Schmaderer, Diminco, Boyer, and Phillips are sued in their individual capacities only and to also remove the "and on behalf of her minor son J.T." language from Plaintiff's party name.

10.    The parties are bound by the Federal Rules of Civil Procedure and by the Local Rules of this Court.  Plaintiff shall keep the Court informed of her current address at all times while this case is pending.  Failure to do so may result in dismissal.

11.    Because this non-prisoner case is proceeding to service of process, and at the direction of the Court, this case is removed from the pro se docket.  The Clerk's office shall randomly assign new judges to this case and request a reassignment order from the Chief Judge.


       Dated this 22nd day of August, 2023.


                                          BY THE COURT:


                                          Joseph F. Bataillon
                                          Senior United States District Judge